**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 17, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

## TENT H CIRCUIT

───────────────────────

WILDEARTH GUARDIANS; ROCKY
MOUNTAIN WILD; THE TOWN OF
SUPERIOR, a Colorado municipality,

      Plaintiffs - Appellants,

and

CITY OF GOLDEN, COLORADO,

      Plaintiff,

v.

UNITED STATES FISH AND
WILDLIFE SERVICE; UNITED
STATES DEPARTMENT OF THE
INTERIOR; S.M.R. JEWELL, acting
in her official capacity as Secretary of
the Interior; DANIEL M. ASHE,
acting in his official capacity as
Director of the United States Fish and
Wildlife Service; NOREEN WALSH,
acting in her official capacity as
Regional Director of the
Mountain-Prairie Region of the United
States Fish and Wildlife Service;
DAVID LUCAS, acting in his official
capacity as Rocky Flats National
Wildlife Refuge Manager,

      Defendants - Appellees,

and

                          Nos. 12-1508 & 12-1509

THE BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF JEFFERSON,
COLOARDO; CITY OF ARVADA;
JEFFERSON PARKWAY PUBLIC
HIGHWAY AUTHORITY;
COLORADO NATURAL RESOURCE
TRUSTEES OF THE STATE OF
COLORADO; THE BOARD OF
LAND COMMISSIONERS OF THE
STATE OF COLORADO,

       Defendant Intervenors -
       Appellees.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:11-CV-03294-PAB)**

---

Neil Levine (James Jay Tutchton, WildEarth Guardians, Centennial, Colorado,
and Matthew Sandler, Rocky Mountain Wild, Denver, Colorado, Timothy
Gablehouse and Melanie Granberg, Gablehouse Granberg, Denver, Colorado, with
him on the briefs), Denver, Colorado, for Plaintiffs-Appellants.

Mary Gabrielle Sprague (Robert G. Dreher, Acting Assistant Attorney General,
U.S. Department of Justice, Environment & Natural Resources Division,
Washington, DC; Andrew C. Mergen and Ellen J. Durkee, U.S. Department of
Justice, Environment & Natural Resources Division, Appellate Section,
Washington, DC, with her on the brief), U.S. Department of Justice, Environment
& Natural Resources Division, Appellate Section, Washington, DC, for
Defendants-Appellees.

Howard Kenison and Patrick G. Compton, Lindquist & Vennum LLP, Denver,
Colorado; Ellen G. Wakeman, Jefferson County Attorney, Writer Mott, Assistant
County Attorney, and Eric Butler, Assistant County Attorney, Jefferson County
Attorney's Office, Golden, Colorado; Christopher K. Daly, City Attorney, and
Roberto Ramirez, Assistant City Attorney, City of Arvada City Attorney's Office,
Arvada, Colorado; John W. Suthers, Attorney General, Daniel S. Miller, Senior

Assistant Attorney General, Edgar Hamrick, First Assistant Attorney General, Jason King, Assistant Attorney General, and Heather Warren, Assistant Attorney General, Office of the Attorney General, State of Colorado, Denver, Colorado, on the brief for Defendant-Intervenors-Appellees.

---

Before **HARTZ**, **HOLMES**, and **BACHARACH**,[*] Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

The U.S. Fish and Wildlife Service ("the Service") conveyed to a consortium of local governments a strip of land ("the corridor") for the construction of a parkway. Its decision was challenged on various environmental grounds by several parties, including WildEarth Guardians, Rocky Mountain Wild, the Town of Superior, and the City of Golden (collectively, "Appellants"). The district court affirmed the Service's actions, and Appellants brought their claims here. They assert that the Service violated the Rocky Flats National Wildlife Refuge Act ("the Rocky Flats Act" or "RFA"), the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("the ESA"). With jurisdiction granted by 28 U.S.C. § 1291, we **affirm** the judgment

---

[*] The late Honorable William J. Holloway, Jr., United States Senior Circuit Judge, was originally assigned to this case and heard oral argument on November 20, 2013. Upon his death, the Honorable Robert E. Bacharach was substituted on this panel. Judge Bacharach has reviewed the record and all the pleadings filed in this matter, has listened to the recording created from the oral argument hearing, and has fully participated in the ultimate resolution of this case.

of the district court.

# I

Rocky Flats (at times, "the Flats") is comprised of roughly 6,200 acres in Colorado.  For a number of years the Department of Energy ("Energy") and its predecessor agency used the central part of the Flats to manufacture components involved in nuclear weapons, while the remainder of the Flats sat idle.  As a result of the weapons work, some of the land became polluted by various hazardous materials, including plutonium.  In 1989, a large-scale cleanup operation began.  Recognizing the progress that had been made in the cleanup effort, Congress passed the Rocky Flats Act in 2001.  National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, 115 Stat. 1012, §§ 3171–82 (2001), 16 U.S.C. § 668dd note.[1]  Under the Rocky Flats Act, Energy was to manage the central area of the Flats (the locus of the earlier nuclear activity) and the balance of the Flats was to become a National Wildlife Refuge run by the Service, an arm of the Department of the Interior.[2]  *See generally* RFA §§ 3175–77.

The Rocky Flats Act further provided that Energy would transfer to the Service administrative jurisdiction of the land marked for refuge status as soon as

---

[1]     Following the lead of the parties, we refer to sections of the Rocky Flats Act, rather than the sections of the U.S. Code, and use the form "RFA § __" where a full citation is needed.

[2]     Because the Service is the only branch of the Department of the Interior that is relevant to this appeal, we refer to the Service even where other materials relevant to this litigation refer to the Department as a whole.

the EPA determined the cleanup was complete. *See id.* § 3175(a). Importantly, the Rocky Flats Act set aside a piece of land along the Flats's border to be made available for transportation improvements. *See id.* § 3174(e)(1)(A). To facilitate the transportation improvements, the Rocky Flats Act provided that, "[o]n submission of an application meeting" certain criteria not relevant to this appeal, "[Energy], in consultation with the [Service], shall make available land along the eastern boundary of Rocky Flats for the sole purpose of transportation improvements along Indiana Street." *Id.* The transfer was to take place within a month of the EPA certifying the cleanup as complete. *Id.* § 3175(a)(2), (3).

Pursuant to the Rocky Flats Act, Energy transferred the Flats to the Service when the EPA issued its certification in 2007. Not long after, Energy and the Service mutually decided that the applications for the transportation improvements were the Service's to consider, in consultation with Energy. And so it was that the Service ended up giving the green light to the exchange underlying this appeal, with Energy's ancillary approval. In that exchange, the Service engineered a complicated deal amongst a number of different parties in which it added some land to the refuge but transferred a roughly 300-foot-wide, 100-acre strip of land to a consortium of local governments that planned to construct a parkway as part of a mostly-completed beltway encircling the Denver metropolitan area.

The Preble's Meadow Jumping Mouse (sometimes, "the mouse") is a

5

threatened species with critical habitat in the corridor.  Prior to its final approval

of the land exchange, and pursuant to the ESA, the Service issued two biological

opinions on the potential consequences of the exchange to the mouse.  The

product of those opinions was a determination that the exchange would not

jeopardize the continued existence of the mouse or adversely modify its critical

habitat.

In addition to the ESA, NEPA imposed on the Service various obligations

regarding the exchange.  Most relevant here, NEPA directs federal agencies to

prepare an environmental impact statement ("EIS") whenever they undertake

"major Federal actions significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(C).  To determine whether the statutory

conditions for preparation of an EIS are present, an agency generates an

environmental assessment ("EA").  *See* 40 C.F.R. § 1501.4(b).  If the EA leads to

the conclusion that no EIS is necessary, the agency creates a "finding of no

significant impact" ("FONSI").  *See id.* § 1501.4(e).  The Service in this case

issued an EA and a FONSI rather than an EIS.  After the EA was circulated for

public comment, the exchange went ahead as planned.

Displeased by the land exchange, Appellants sued in federal district court,

challenging the Service's actions on three grounds: (1) they violated the Rocky

Flats Act; (2) they violated NEPA; and (3) they violated the ESA.  The district

court rejected all three claims and upheld the exchange.  Appellants timely

6

appealed, reviving the same three grounds.

## II

We consider the appeal under the analytical rubric established by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2)(C) (providing that the courts will set aside agency action taken "in excess of statutory jurisdiction"); *Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1008 (10th Cir. 2012) (applying the APA to a NEPA claim); *Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1320 (10th Cir. 2007) (applying the APA to an ESA claim). Under the APA, we owe the district court's determination no deference. *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1226–27 (10th Cir. 2011). However, we may only set aside the Service's actions if, as relevant to the arguments here, it acted arbitrarily or capriciously, not in accordance with the law, beyond its jurisdictional authority, or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

That test is met when an agency fails to consider "the relevant data" or fails to put forth "a rational connection between that data and its decision." *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1182–83 (10th Cir. 2013). It is also met when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S.,*

*Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Our deference to the agency is more substantial when the challenged decision involves technical or scientific matters within the agency's area of expertise." *Nat'l Park Serv.*, 703 F.3d at 1183.

## III

Appellants challenge the Service's actions on three statutory bases: specifically, the Rocky Flats Act, NEPA, and the ESA. Because they fail to show violations of any of these Acts, we affirm.

## A

Appellants first contend that the Service lacked the authority to convey the corridor under the Rocky Flats Act. Constrained by our deferential standard of review, we uphold the Service's authority.

## 1

We must first ascertain the appropriate framework for assessing the Service's power. The APA directs courts to set aside agency actions that are taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Because of this provision, "an essential function of our review under the APA is determining whether an agency acted within the scope of its authority." *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 801 (10th Cir. 2010). If it is otherwise appropriate, we apply the test established by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837

(1984), when asking whether an agency has acted within its authority. *See Pub. Lands Council v. Babbitt*, 167 F.3d 1287, 1293–94 (10th Cir. 1999); *see also Iowa League of Cities v. EPA*, 711 F.3d 844, 876 (8th Cir. 2013) ("Appellate review under APA section 706(2)(C) proceeds under the familiar *Chevron* framework.").

As a preliminary matter, Appellants insist that it is *not* otherwise appropriate to apply *Chevron* because the Rocky Flats Act is not "administered" by the Service. *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1147 (10th Cir. 2013) ("When reviewing an agency's construction of a statute it *administers*, we apply the well-known, two-step analysis articulated in *Chevron* . . . ." (emphasis added)). Its argument to that effect is limited to the contention that Congress in the Rocky Flats Act did not "delegate administration" to the Service, but rather "regulate[d]" the Service's "actions and obligations concerning Rocky Flats," and those of Energy. Aplts.' Opening Br. at 19.

The cases that Appellants cite[3] do not draw any distinction between statutes that "regulate" an agency and those that are "administered" by one. Indeed, it would be odd if the law did draw such a distinction, as any statute that an agency administers necessarily regulates that agency to some extent, at least in the sense that it imposes various obligations on the agency and instructs it to take various actions. In the Rocky Flats Act, Congress imposed a number of obligations on

---

[3]        *City of Arlington v. FCC*, --- U.S. ----, 133 S. Ct. 1863 (2013), and *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116 (10th Cir. 2009).

both Energy and the Service, and provided them a wide latitude in how they fulfilled many of those obligations.  That is sufficient to defeat Appellants' false dichotomy and to apply the *Chevron* framework.[4]

2

The *Chevron* test requires us to ask first "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.  If it has, "that is the end of the matter" and we do as instructed by Congress.  *Id.*  If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.  Our inquiry must begin, then, with this question: Did Congress directly address the matter of whether the Service could convey the corridor?  Focusing on the language of the statute, as we must, *see Bd. of Cnty. Comm'rs v. EEOC*, 405 F.3d 840, 844 (10th Cir. 2005), we conclude that it did not.  One provision of the Rocky Flats Act states that "[o]n

---

[4]     If Appellants mean to suggest that *Chevron* is inapplicable because the case does not involve the Service's "organic" statute, i.e., the law that actually established the agency, they are mistaken in assuming that *Chevron* is always limited to such circumstances.  *See NISH v. Rumsfeld*, 348 F.3d 1263, 1267–72 (10th Cir. 2003) (applying *Chevron* to the Department of Education's interpretation of an act that was not its organic statute).  On a similar note, Appellants do not argue that the Service's conveyance of the land falls outside *Chevron* because it lacked the trappings of formal rule-making or adjudication, *see generally United States v. Mead Corp.*, 533 U.S. 218 (2001), so we do not address that issue.  They also decline to argue that Energy, and not the Service, is entitled to deference regarding the implementation of the pertinent provisions of the Rocky Flats Act.  We therefore forgo any discussion of that point.

10

submission of an application meeting" certain criteria, "[Energy], in consultation with the [Service], shall make available land along the eastern boundary of Rocky Flats for the sole purpose of transportation improvements along Indiana Street." RFA § 3174(e)(1)(A).  Another section of the Act, which falls under the heading "transfer of management responsibilities and jurisdiction over Rocky Flats," states that, "[s]ubject to the other provisions of this section, [Energy] shall transfer administrative jurisdiction over the property that is to comprise the refuge to the [Service]."  *Id.* § 3175(a)(1).

Collectively, these provisions leave the crucial question here unanswered. We know that Energy, at some point, has the authority to convey the land solely for transportation purposes.  And we know that, at a certain point, Energy will transfer jurisdiction over the whole refuge[5] to the Service.  What we do not know from the statute's plain language is whether the authority—indeed, the obligation—to make the land available for transportation purposes switches to the Service upon Energy's transfer to the Service of jurisdiction over the refuge, or whether, as Appellants maintain, that authority is extinguished upon this transfer by Energy because Congress intended to vest *only* Energy with the authority to

---

[5]     In their opening brief, Appellants unequivocally took the position that Congress placed the corridor within the refuge.  *See, e.g.*, Aplts.' Opening Br. at 20 ("Congress ensured the Corridor would not become a highway *once it became part of the refuge*." (emphasis added)).  We therefore undertake the following analysis on the basis of that premise.

11

make the land available.[6]  Regarding this question, the Rocky Flats Act is silent;
therefore, we turn to step two of *Chevron*.

### 3

Thus the question becomes "whether the agency's answer is based on a
permissible construction of the statute." *Chevron*, 467 U.S. at 843.  An agency
interpretation is permissible where it "is not 'arbitrary, capricious, or manifestly
contrary to the statute.'" *Berneike*, 708 F.3d at 1148 (quoting *Chevron*, 467 U.S.
at 843–44).

### a

Most saliently, preventing Appellants from showing that the Service's
answer is not permissible are two of the oldest and most established canons of
statutory construction: (1) effectuating the intent of Congress; and (2) taking the

---

[6]     We recognize that there may be a third possibility: Energy retained
the ability to make the corridor available for transportation purposes even after
transferring jurisdiction over the land that would constitute the refuge, including
the corridor, to the Service.  However, Appellants have eschewed this option, and
instead have consistently maintained that neither agency had the authority to
make the corridor available for transportation improvements after jurisdiction
over the land that included the corridor was transferred to the Service.  *See, e.g.*,
Aplts.' Opening Br. at 14 ("The . . . authority to convey the Corridor . . . was
limited and has now expired. . . .  [T]his authority existed only so long as
[Energy] retained jurisdiction and the Corridor was not part of a National Wildlife
Refuge."); *id.* at 20 ("The authority . . . to convey the corridor terminated when
the refuge was established." (capitalization removed)); *id.* at 22 ("Now that the
Corridor is part of the Refuge, it must remain so.").  Thus, we need not entertain
this alternative explanation.  And, in any event, the statute does not make pellucid
that Energy retained authority after the transfer, so this interpretation fails step
one of *Chevron*.

statutory language in context. *See United States v. Handley*, 678 F.3d 1185, 1189 (10th Cir. 2012) ("It is our primary task in interpreting statutes to determine [C]ongressional intent . . . . If the statute's plain language is ambiguous as to Congressional intent, we look to the legislative history and the underlying public policy of the statute. . . . When considering the language employed by Congress, we read the words of the statute in their context and with a view to their place in the overall statutory scheme . . . ." (alteration in original) (internal quotation marks omitted)); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("[I]t can be said more generally that the resolution of an ambiguity . . . that achieves a statute's purpose should be favored over a resolution that frustrates its purpose."); *id.* at 167 ("Context is the primary determinant of meaning."). These guidelines strongly militate in favor of the Service's authority to convey the land.

### i

First, Congress clearly passed the Rocky Flats Act with the intent, in part, to relieve the burden on transportation in the area. Indeed, there is no other conceivable reason why it included the provision, and Appellants do not propose one. Keeping that congressional interest in mind, Appellants' construction of the Rocky Flats Act clearly thwarts it. As Appellants see it, the Rocky Flats Act gives Energy the authority to convey the corridor for transportation improvements until the area is fully clean and a refuge (that is, until the area is in such a

13

condition that administrative jurisdiction over it may be transferred to the

Service), at which point *no one* has that conveyance authority and the corridor can

*never* be subject to transportation improvements.  But Appellants offer no reason

why Congress would limit the possibility of transportation improvements to such

a narrow window (before the cleanup is completed) and then close it forever

thereafter.  Such a system would certainly not further the congressional purpose

of allowing for long-term improvements to local traffic patterns.

**ii**

In a related fashion, a glance at the context of the Rocky Flats Act as a

whole illuminates congressional intent with respect to the more specific issue of

the administrative duties and rights imposed on Energy and the Service

respectively; the effect of this glance is to undermine Appellants' reading of the

statute.  It reveals that in the Rocky Flats Act, Congress intended for Energy to

handle energy-related matters and the Service to handle nature-related matters—a

reasonable and logical division of responsibilities.

Section 3174 of the Rocky Flats Act contains the provision regarding the

conveyance of the corridor.  The very next section is entitled "transfer of

management responsibilities and jurisdiction over Rocky Flats," and it begins by

stating that "[Energy] shall transfer administrative jurisdiction over the property

that is to comprise the refuge to the [Service]."  RFA § 3175(a)(1).  Energy only

had the land because of the nuclear facilities it once contained, the remnants of which required removal; this removal work was a core element of Energy's operations. *See United States v. Manning*, 527 F.3d 828, 839 (9th Cir. 2008) (discussing Energy's role in "the nationwide management of nuclear waste"). Under the legislative scheme, it only stands to reason that the Service would take control of the land and its disposition when it becomes a refuge, because managing refuges is firmly within the Service's bailiwick. *See* 16 U.S.C. § 668dd(a)(1) (directing the Service to administer federal refuges). The scheme is further elucidated by the fact that the Rocky Flats Act directs Energy to retain jurisdiction only over facilities related to the continuing cleanup efforts. *See* RFA § 3175(d). Put simply, the Rocky Flats Act acknowledges that Energy should take care of energy-related matters and the Service should take care of nature-related matters.[7]

Appellants read an exception into the Rocky Flats Act that cannot be squared with this common-sense administrative allotment. For under their

---

[7] Appellants' best interpretive argument is that other provisions of the Rocky Flats Act explicitly apply to both Energy and the Service, and this one does not, thereby implying that only the former has the authority to convey the corridor. *See, e.g.*, RFA § 3174(c) ("*Neither* [Energy] *nor* the [Service] shall allow the annexation of land within the refuge by any unit of local government." (emphases added)). Nevertheless, at best, this point shows that there are *other* reasonable interpretations of the Act in addition to the Service's. It does not show that Appellants' is the only plausible alternative. Under *Chevron*, we must still therefore defer to the Service's interpretation.

15

reading, Energy—and Energy alone—could convey the corridor for transportation improvements.  Yet, Appellants fail to explain why Congress would have wanted long-lasting improvements only if a deal to effectuate these improvements could be reached before the administrative hand-off occurred between Energy and the Service.  Moreover, managing such a project (and ensuring that it does not unduly impair the refuge) clearly falls squarely within the Service's administrative responsibilities, as the Service is in charge of refuge-related matters.[8]

### b

In addition to the Rocky Flats Act, the Service argues that it had the complimentary authority to convey the land under the National Wildlife Refuge System Act ("the Refuge Act") and the Fish and Wildlife Act.  Appellants' only response is that the Service never invoked those Acts during the administrative process and thus cannot avail themselves of them now.  Although "[i]t is well-established that an agency's action must be upheld, if it all, on the basis articulated by the agency itself," *State Farm*, 463 U.S. at 50, Appellants are simply wrong that the Service cited the Rocky Flats Act as its only authority.  *See*

_____

[8]    Appellants insist that our "interpretation would also render the language in § 3174(e)(1)(A) meaningless."  Aplts.' Opening Br. at 19.  Not so.  As we read it, § 3174(e)(1)(A) made clear that Energy had the power to convey the corridor *before* the refuge was established, whereas the Service was intended to have the power afterwards.  The provision therefore served a definite role, albeit one that became irrelevant after the land was transferred from one agency to the other.

Aplts.' App. at 386 (Agreement for the Exch. of Lands) (relying on the Refuge Act); *id.* at 412 (Envtl. Assessment, prepared Dec. 8, 2011) (relying on the Fish and Wildlife Act and the Refuge Act); *id.* at 514 (Response 105.17) (relying on the Fish and Wildlife Act). Because Appellants' only argument against the Service's authority under the Refuge Act and the Fish and Wildlife Act is predicated on a misunderstanding of the record, we reject it for that reason alone. *See United States v. Yelloweagle*, 643 F.3d 1275, 1284 (10th Cir. 2011) (noting that we will not "make arguments for" a litigant).

Even were we to reach the substance of Appellants' contention, we would conclude that these additional authorities strengthen the Service's position. A provision of the Refuge Act authorizes the Service to "[a]cquire lands or interests therein by exchange . . . for acquired lands or public lands, or for interests in acquired or public lands." 16 U.S.C. § 668dd(b)(3). A similar provision of the Fish and Wildlife Act provides that the Service shall "take such steps as may be required for the development, advancement, management, conservation, and protection of fish and wildlife resources including . . . acquisition by purchase or exchange of land and water, or interests therein." *Id.* § 742f(a)(4). Given the ambiguity of the Rocky Flats Act's plain language, the fact that the Service enjoys the power to enter into land exchanges like this one as a general matter bolsters the reasonableness of the Service's view that it had the power to preside

17

over the exchange here. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").[9]

### 4

On a final point, we directed the parties to submit supplemental briefs on the potential bearing that RFA § 3175(d)(1)(B) has on the Service's authority to convey the corridor. Having considered the additional arguments on that question, we determine that the provision does not affect the analysis set forth above.

According to this provision,

> "[t]he transfer required by subsection (a) shall not include, and [Energy] shall retain jurisdiction, authority, and control over, the following real property and facilities at Rocky Flats: . . . [a]ny real property or facility to be used for any other purpose relating to a response action *or any other action that is required to be carried out by [Energy]* at Rocky Flats."

---

[9]    At oral argument, Appellants averred that the Refuge Act and the Fish and Wildlife Act mandate different procedures that the Service was required to comply with if it intended to use them. Appellants did not make this argument in their briefs, so we decline to consider it. *See United States v. Rutland*, 705 F.3d 1238, 1247 n.2 (10th Cir. 2013) ("[W]e do not address arguments raised for the first time at oral argument."). In any event, we are not holding that the Service did or did not follow all of the statutory prerequisites for relying on the Refuge Act and the Wildlife Act; we are holding only that the Acts establish the Service's authority to organize similar deals, that the Service did invoke the Acts as part of its authority during the administrative process (regardless of whether it observed all of the technicalities articulated by the Acts), and that the Service is therefore now entitled to cite the Acts to support the reasonableness of its statutory interpretation of the Rocky Flats Act.

18

RFA § 3175(d)(1), (d)(1)(B) (emphasis added).  Subsection (a), in turn, provides that "[s]ubject to the other provisions of this section, [Energy] shall transfer administrative jurisdiction over the property that is to comprise the refuge to the [Service]."  *Id.* § 3175(a)(1).

Appellants submit that this catch-all clause—"or any other action"—refers to the corridor, as Energy was tasked with making it available for transportation improvements.  *See* RFA § 3174(e)(1)(A).  Thus, as Appellants see it, § 3175(d)(1)(B) indicates that Energy was never supposed to hand over the corridor to the Service.  *See* Aplts.' Supp. Br. at 6 ("Congress anticipated that [Energy] would not transfer the Corridor to [the Service] for inclusion in the Refuge.").  This, reason Appellants, "explains why Congress, in Section 3174(e)(1)(A), authorized only [Energy] to 'make available' the Corridor, and not [the Service]."  *Id.*

Notably, Appellants take the position that Energy "did not, in fact, retain the Corridor" when it transferred to the Service administrative jurisdiction over the land allocated for the refuge.  *Id.*  And, because Energy supposedly "missed its opportunity to retain this property" by virtue of the transfer, it forfeited the authority to convey the corridor for transportation purposes that it otherwise would have had under the congressional grant of § 3175(d)(1)(B).  *Id.*; *see id.* ("*Had [Energy] retained jurisdiction* in accordance with Section 3175(d)(1)(B),

[Energy] could convey the Corridor for transportation improvements in accordance with Section 3174(e)(1)(A)." (emphasis added)).  Nevertheless, according to Appellants, this transfer to the Service does not alter the fact that Congress never intended for the Service to have jurisdiction over the corridor.  *Id.* at 7 ("The fact that [Energy] did not retain jurisdiction over the Corridor, or convey it before the 2007 transfer, does not change the fact that [the Service] never had authority under the Rocky Flats Act to engage in the 2011 Land Exchange.").  We cannot accept Appellants' argument.

We begin by explaining Appellants' reasoning in greater detail.  They contend that "other than the various response actions and the duty to make available the Corridor, there are no required actions for [Energy] at Rocky Flats." Aplts.' Supp. Br. at 5.  As a result, the "any other action" language "must involve [Energy's] requirement to make available the Corridor, or else the" phrase has no significance and "that would violate the statutory construction principle to give meaning to all provisions."  *Id.*  Appellants' argument proves too much.  As they acknowledge, "any other action" is a "catch-all clause."  *Id.* at 4.  We find it difficult to believe that Congress would use a highly generalized "catch-all clause" to express its intent regarding a *single*, extremely specific issue—*viz.*, making the corridor available for transportation improvements.  Indeed, in the Rocky Flats Act itself Congress issued detailed instructions regarding the

transportation improvements.  *See* RFA § 3174(e).  Consequently, it would be rather surprising if Congress decided to set out its intent regarding the corridor at length in one section and then in the next decided to use an abstract, amorphous phrase to refer *solely* to the corridor.  In other words, Congress knew how to write "transportation improvements" in § 3174(e).  Presumably, it knew how to write it as well in § 3175(d)(1)(B), if indeed that is what it meant there too.  But it did not do so.

Contrary to Appellants' view that making the corridor available was the only action left for Energy that could be captured by the catch-all clause, arguably another way that one might view the clause as related to the corridor is if it refers to a larger category that *includes* actions concerning the corridor.  Recall that the "or any other action" clause is framed to cover Energy's undertakings at Rocky Flats *aside from* those related to "response actions."  RFA § 3175(d)(1)(B).  The Rocky Flats Act defines "response action" with reference to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, and with reference to the Colorado Hazardous Waste Act.  *See* RFA § 3173(6).  In its supplemental brief, the Service describes other responsibilities that Energy "has had that are not fairly characterized as 'response actions,'" such as the construction of dams and possibly actions ancillary to its environmental clean-up duties.  Aplees.' Supp. Br. at 4 & Ex. 1.

For our purposes, the pivotal point is not how accurate the Service's listing of responsibilities is; rather, it is whether it is reasonable to infer that Congress could have been concerned about the *possibility* that Energy might have tasks to perform at Rocky Flats that were not *necessarily* enveloped by the term "response action," as the RFA has defined it. And we think that inference is quite reasonable.

In that regard, the transformation of Rocky Flats from a pollution-plagued former nuclear-weapons operation into a national refuge was an enormous undertaking that lasted decades and involved extensive collaboration between numerous state and federal agencies. Energy played a major role in that effort, as it had managed the land for many years prior. Even as Congress provided for the transfer of much of the area from Energy to the Service, it obviously foresaw a continued role for Energy, for it spelled out a number of duties Energy had left to discharge. In light of these facts, the proposition that it was possible that Energy might have responsibilities relating to Rocky Flats that were not sufficiently encompassed by the term "response actions" is, in our opinion, irrefutable.

The remaining question, then, is whether making the corridor available can be regarded as falling into this category along with any other matters outside the "response action" bucket. We do not believe that it can. The catch-all phrase makes good sense as a precautionary measure to capture any duties Congress had

22

not specifically foreseen falling upon Energy but that Energy would need to perform. It makes far less sense as a reference to a specific issue—making the corridor available—that Congress not only foresaw but also addressed at some length in the RFA itself. Thus, we reject Appellants' contention that the catch-all "or any other action" clause of § 3175(d)(1)(B) refers to the corridor and, more specifically, making it available.

It is helpful to place the foregoing analysis within the context of *Chevron*. For § 3175(d)(1)(B) to alter the outcome, we must find that it is either (1) an unambiguous directive prohibiting the Service from conveying the corridor; or (2) evidence of congressional intent sufficient to render the Service's interpretation unreasonable. Neither finding is justified. Far from being unambiguous, § 3175(d)(1)(B) speaks in extraordinarily broad, vague language that has no obvious or explicit connection to the corridor, or to the Service's powers with respect to the corridor. As for *Chevron* step two, given the many aforementioned reasons for concluding that the Service's interpretation is reasonable, we do not believe that § 3175(d)(1)(B) can establish its unreasonableness.

For all of the reasons discussed above, we reject Appellants' argument that the Service lacked the authority to convey the corridor under the Rocky Flats Act.[10]

---

[10]     Appellants observe that the Service earlier understood the Rocky
(continued...)

23

**B**

Appellants believe the Service violated NEPA with respect to three main factual areas: (1) contaminated soils; (2) air pollution; and (3) the Preble's Meadow Jumping Mouse. They do not adequately show a NEPA violation in any of these areas.

**1**

In NEPA, Congress codified rules designed to "focus[] both agency and public attention on the environmental effects of proposed actions" and thereby "facilitate[] informed decisionmaking by agencies and allow[] the political process to check those decisions." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009). The Act does so in two ways: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its

---

[10](...continued)

Flats Act to endow Energy with the exclusive authority to convey the corridor. However, the Service's statements that Appellants point to in making their case for agency inconsistency were all either made before the Flats was transferred to the Service and established as a refuge, or simply recite the indisputable fact that the Rocky Flats Act gave Energy the authority to convey the land *before* the establishment of the refuge. The statements are therefore entirely irrelevant to the question of whether the Service had the authority to transfer the land *after* it assumed administrative jurisdiction over it, and that is the only question before us. Thus, assuming *arguendo* that they are legally relevant, Appellants' claims of agency inconsistency have no factual basis in the record.

decisionmaking process." *Wyoming*, 661 F.3d at 1236–37 (quoting *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 711 (10th Cir. 2010)) (internal quotation marks omitted).  The Supreme Court has made clear that "NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Under NEPA, federal agencies must prepare an EIS whenever they undertake "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  To determine whether an impact statement is warranted, an agency generates an EA, 40 C.F.R. § 1501.4(b), a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]," *id.* § 1508.9(a)(1).  The assessment must "include brief discussions of the need for the proposal, of alternatives . . . , [and] of the environmental impacts of the proposed action and alternatives."  *Id.* § 1508.9(b).  As such, an EA must consider "the cumulative impacts of a project," *Davis v. Mineta*, 302 F.3d 1104, 1125 (10th Cir. 2002), as well as its "indirect effects," *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 433 (10th Cir. 1996).  Distilled to its essence, "[t]he EA is a rough-cut, low-budget [EIS] designed to show whether a full-fledged [EIS]—which is very costly and time-consuming to prepare and has been the kiss of death to many a

25

federal project—is necessary." *Spiller v. White*, 352 F.3d 235, 237 (5th Cir. 2003) (quoting *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 677 (5th Cir. 1993)) (internal quotation marks omitted).

If the EA leads to the conclusion that no impact statement is necessary, the agency also creates a FONSI, 40 C.F.R. § 1501.4(e), "a document . . . briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared," *id.* § 1508.13.

The Service in this case issued an EA and FONSI rather than an impact statement, a decision Appellants contest.

### 2

"An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (quoting *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002)) (internal quotation marks omitted). We therefore ask "whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment." *Id.* (quoting *Davis*, 302 F.3d at 1112) (internal quotation marks omitted). As a general principle, "the judiciary's role in the NEPA context is merely to ensure that the federal agency takes a hard look at

the environmental consequences of its actions." *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1225 (10th Cir. 2002). "[A] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Prairie Band*, 684 F.3d at 1008 (quoting *Richardson*, 565 F.3d at 704) (internal quotation marks omitted). That said, "our review of an EA/FONSI has a substantive component as well as a component of determining whether the agency followed procedural prerequisites." *Davis*, 302 F.3d at 1112. "If the plaintiffs can demonstrate substantively that the [agency's] conclusion of non-significant effect on the environment represents a 'clear error of judgment,' then that conclusion must be reversed." *Id.* (quoting *Utah Shared Access Alliance*, 288 F.3d at 1213).

**3**

**a**

Appellants first assert that the Service had an obligation to prepare an impact statement in regards to soil contaminants, and in particular plutonium. As noted, an agency is compelled to complete an impact statement where its proposed action "*may* significantly affect the quality of the human environment." *Norton*, 294 F.3d at 1224 (emphasis added). The term "significantly" is defined in part with reference to "[t]he degree to which the proposed action affects public health or safety." 40 C.F.R. § 1508.27(b)(2). In Appellants' view, the parkway

potentially significantly affects the quality of the human environment because its construction will release dangerous levels of plutonium. They therefore assert that the Service was compelled to conduct an EIS concerning plutonium.

In defense of its decision not to conduct a full-blown EIS with regard to plutonium, the Service relied (and continues to rely) on assurances it received from the EPA. More specifically, in 2006 the EPA certified that conditions in the area where the corridor would be situated were "acceptable for unrestricted use and unlimited exposure." Aplts.' App. at 132 (Corrective Action Decision, prepared Sept. 2006).[11] Five years later, at the Service's request—and prior to its decision to enter into the land exchange—the EPA clarified that this clearance applied to the construction of the proposed parkway as well.

In their opening brief, Appellants challenge the EPA's advice as "inapplicable," because it was supposedly premised on the assumption that no soil disturbance would take place, and thus did not account for the construction of a parkway. Aplts.' Opening Br. at 31. This is arguably true of the 2006 report, but quite obviously *not* true of the 2011 letter, which explicitly addressed the parkway construction and explicitly confirmed that such construction posed no risk of exposing anyone to an unacceptable level of radioactive material.

_____

[11]     Other state and federal agencies were involved in the preparation of this report. It is not disputed that the EPA played a major role in preparing the report and, more importantly, that it issued the subsequent clarification of the report, and those are the essential facts for our purposes.

There is no apparent impropriety in the Service's use of the letter.  NEPA itself instructs agencies that are deciding whether an impact statement is called for to make use of the "views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards." 42 U.S.C. § 4332(C)(v).  With respect to the plutonium issue here, the EPA is undeniably such an agency.  *See generally Waste Action Project v. Dawn Mining Corp.*, 137 F.3d 1426 (9th Cir. 1998) (discussing the EPA's role in regulating radioactive materials).  Tacitly conceding these points, Appellants press two rebuttals: (1) the letter "was not subject to any of the formal procedures that accompany a CERCLA determination," Aplts.' Reply Br. at 11; and (2) it was based on flawed reasoning.[12]

The first argument is unsupported by any authority or elaboration, and is thus inadequately articulated to warrant our consideration of it.  *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").  At any rate, to the extent that we can discern its substance, the argument is unconvincing.  As noted, NEPA encourages agencies

---

[12]    We do not understand Appellants to argue that the 2011 letter was not part of the EA; insofar as they believe that to be the case, they have insufficiently presented the contention.  *See United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997) ("[I]t is the appellant's responsibility to tie the salient facts, supported by specific record citation, to [his] legal contentions." (second alteration in original) (internal quotation marks omitted)).

to rely on the "views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards."  42 U.S.C. § 4332(C)(v).  The statute does not limit itself to "views of requisite formality," and we are reluctant to insert language where Congress has elected not to.  *See, e.g.*, *Marchetti v. United States*, 390 U.S. 39, 60 n.18 (1968) (noting that courts should not insert words into statutes that their drafters omitted); *see also Biodiversity Conservation Alliance v. U.S. Forest Serv.*, 765 F.3d 1264, 1270 (10th Cir. 2014) ("NEPA grants substantial discretion to an agency to determine how best to gather and assess information.").  Furthermore, the 2011 EPA letter is reasonably read as a clarification and elaboration of the 2006 report; the letter extrapolates from the 2006 findings to explain the risk to construction workers.  As such, it was reasonable of the Service to regard the letter as, in essence, a continuation of the CERCLA process that the EPA had begun several years earlier.  Consequently, any difference in formality between the 2011 letter and the 2006 report is not dispositive, and certainly does not demonstrate any arbitrary or capricious conduct on the Service's part.

Appellants' second objection to the 2011 letter—that its reasoning is flawed—is even less substantial.  They complain that the letter "*equates* a wildlife refuge worker . . . with construction workers," even though the two are "not comparable."  Aplts.' Reply Br. at 12 (emphasis added).  But the letter does no

such thing.  In the 2006 report, the EPA had considered the health risks associated

with plutonium exposures of wildlife refuge workers, but had no occasion to

examine such risks as to construction workers.  However, in reaching its

conclusion in the 2011 letter that the construction posed no risk of exposing

anyone to an unacceptable level of radioactive material, the EPA explained that it

took account of the difference between the two types of employees—"includ[ing]

the potential for greater rates of inhalation and ingestion of soil by the

construction worker"—but determined that the "differences are likely offset by

the much greater exposure duration" for refuge workers, relative to construction

workers who would just be exposed for "a few months."  Aplts.' App. at 527

(Letter from Carl Spreng to David Lucas, dated Sept. 21, 2011).  The EPA's logic

is straightforward and comprehensible: although construction workers are likely

to face greater exposures to plutonium than wildlife refuge workers, they will

likely be exposed for much shorter periods of time and, therefore, the risks they

face are essentially comparable to those of wildlife refuge workers, whom the

EPA concluded faced acceptable levels of risk.  We have no reason to doubt the

EPA's logic, nor to fault the Service for relying on it.

Finally, Appellants articulate a highly detailed criticism of the EPA's

conclusion based on the supposed areas that were cleaned and the supposed levels

of acceptable hazardous materials.  Again, its criticism cannot be squared with the

contents of the 2011 letter.  In the relevant section of the letter, the EPA indicated

that it was addressing dangers to construction workers insofar as they would be

working on a construction project related to "a future land transfer at the eastern

edge of the site, as per provisions of the [Rocky Flats Act]."  Aplts.' App. at 527.

In other words, the EPA specifically had in mind the project Appellants are now

alleging would release a dangerous amount of radioactive material.  And it

specifically rejected the allegation that Appellants advance.  For us to now

second-guess its judgment and hold that the EPA was not in fact aware of the

terms of its own analysis would be to "substitute our judgment for that of the

agency's," and that we may not do.  *Ass'ns Working for Aurora's Residential

Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1130 (10th Cir. 1998).

Recognizing the EPA's authority in the pollutants arena, the Service reasonably

consulted it and was given its approval to proceed.  Simply put, the Service took a

"hard look" at the relevant environmental conclusions reached by an expert

agency, and we are in no position to disturb its decision with regard to soil

contaminants.

**b**

Appellants next discern NEPA violations in the Service's failure to take "a

'hard look' at ozone[, i.e., smog,] and nitrogen dioxide pollution," and in its

"fail[ure] to support its conclusion that these air quality impacts will be

32

insignificant." Aplts.' Opening Br. at 32. Neither contention justifies reversal.

i

Appellants believe that the Service failed to adequately consider the impacts the construction of the parkway would have on smog, despite having ample data on the issue at hand, by choosing to rely on state studies. They clarify in their reply brief that their objection to the Service's reliance on the state studies is chiefly that the studies relied on purportedly outdated EPA air quality standards. In 2008, the EPA revisited those standards and Appellants insist that the Service should have utilized the new standards.

This argument does not survive the rigor of an arbitrary-and-capricious review. The Service avers that the 2008 rules had not yet been implemented when the EA was being prepared and Appellants do not dispute that fact. *See* Implementation of the 2008 National Ambient Air Quality Standards for Ozone, 77 Fed. Reg. 30,160, 30,161 (May 21, 2012) (noting that the "EPA deferred initial designation of areas for the 2008 ozone NAAQS" and only proposed rulemaking to "address the classifications and attainment deadlines" in February 2012). Therefore, Appellants' argument is essentially that the Service acted arbitrarily and capriciously in relying on studies predicated on then-prevailing standards promulgated by the nation's leading environmental agency, simply because new standards were forthcoming. Not surprisingly, they have no caselaw to support

that proposition.  Appellants fail to overcome the "presumption of validity" that "attaches to the agency action." *Prairie Band*, 684 F.3d at 1008 (quoting *Richardson*, 565 F.3d at 704) (internal quotation marks omitted).  There was no NEPA violation with respect the Service's reliance on the state studies.

### ii

Appellants also fault the Service for not sufficiently analyzing—or disclosing—the emissions that would result from the construction of the parkway.  In its EA, the Service noted that the parkway project would be required to comply with current and future air quality standards.  Ultimately, Appellants have no good explanation as to why it was inadequate of the Service to rely on the fact that the parkway project would be subject to continuing environmental requirements.  Appellants' largely unsubstantiated position is also complicated by a more fundamental question regarding what the proposed federal action here is.  Though Appellants' briefing could be read to imply that the federal action being challenged is the construction of the parkway, they acknowledged at oral argument that the construction is really just a *consequence* of the action under attack, which is—understood in its most reasonable terms—only the land exchange.  Although the distinction may be a technical one, since Appellants fairly regard the exchange and the parkway as closely related, it is nevertheless a distinction that tips the scales in the Service's favor because we are called upon in

34

part to determine whether the level of detail that the Service offers regarding the environmental effects of the parkway's construction—here, effects relating to emissions—is reasonable.  Seemingly, were the federal action the parkway construction itself, rather than the land exchange, the Service would have had access to a far more detailed actual construction plan than the hypothetical plan that the Service had before it during the NEPA process.  Such a plan would have provided the foundation for a more extensive environmental analysis regarding the parkway's construction, including emissions.

All of this is enough to mean that the Service gets the benefit of the doubt in relying on future regulation and compliance for a parkway that (at least at material times) was not yet a reality.  In this same vein, Intervenors'[13] detailed explication of the battery of state and federal environmental hoops the parkway will have to jump through before it can come into being adds even further weight to the Service's approach here.  At the end of the day, the only rejoinder Appellants have is that "[n]one of these studies or commitments were relied upon in [the Service's] decision-making documents, none are directly enforceable by [the Service], and none were imposed . . . as conditions of the land exchange."  Aplts.' Reply Br. at 10 n.5.  But the Service *did* fundamentally rely on the

---

[13]    Intervenors are comprised of Jefferson County, the City of Arvada, the Jefferson Parkway Public Highway Authority, the Colorado Natural Resource Trustees, and the Colorado State Board of Land Commissioners.

supposition that the parkway would have to obtain environmental clearances that would ensure its compliance with the same laws and standards the Service itself would have considered if it were *directly* approving the construction of the parkway itself.  *See Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 583 (6th Cir. 2014) (finding an EA sufficient, in part, based on its discussion of "future requirements the [proposed action] will have to meet to secure construction and operation permits" because those permits would need to be obtained "before construction and operation (and the resulting environmental impacts) could begin").

It is also significant that Congress imposed on the transportation improvement plan the requirement that it be "included in the regional transportation plan of the metropolitan planning organization designated for the Denver metropolitan area."  RFA § 3174(e)(2)(B)(ii).  This occurred with respect to the parkway project.  As required by federal law, the planning organization verified that each of its undertakings—the parkway included—would meet federal emissions standards.  *See* 23 U.S.C. § 134(i)(3).  The Service was thus on solid ground in relying on procedures for future environmental oversight, as Congress specifically provided an important mechanism in that regard.

### iii

Turning to Appellants' next contention, they maintain that the Service's

36

treatment of nitrogen dioxide emissions from vehicles on the proposed parkway violated NEPA in the following respects: (1) it failed to quantify emissions; (2) it omitted "an alternative qualitative description of the public health impacts associated with" emissions; and (3) it failed to consider whether emissions would comply with a nitrogen dioxide standard adopted by the EPA in 2010. Aplts.' Opening Br. at 32. In response, the Service argues that the evolving nature of the EPA standards regarding nitrogen dioxide made it impractical to fully consider the matter in its EA and made it more appropriate to rely on local government to ensure that any transportation projects comply with national benchmarks.

Appellants' attack on the Service's explanation is twofold: (1) "agencies cannot avoid NEPA significance by claiming impacts are unclear or require additional study"; and (2) modeling of nitrogen dioxide emissions *is* available. Aplts.' Opening Br. at 38. Both of these assertions imply that the Service refused to consider nitrogen dioxide impacts because of difficulties assembling the pertinent *data*. That is not, however, why it left the impacts out of its EA. Rather, it did so because the forthcoming *legal* standards had not yet been promulgated. *See* Aplts.' App. at 474 ("In the absence of *final standards and guidance*, modeling how current, approved regional transportation plans comply with the new standards for these pollutants would be difficult at best." (emphasis added)); *see also* Primary National Ambient Air Quality Standards for Nitrogen

37

Dioxide, 75 Fed. Reg. 6474, 6520 (Feb. 9, 2010) (stating that "initial [nitrogen

dioxide] designations" would be promulgated by January 2012).  What Appellants

need—and what they completely lack—is any authority or tenable argument on

why it was arbitrary or capricious for the Service to rely on the future

commitments of state and local entities in the absence of clear nitrogen dioxide

guidelines from the EPA.  Given that void of argument and authority, their

nitrogen dioxide claim fails.

<strong>c</strong>

Appellants contend that the Service violated NEPA in its EA with respect

to its treatment of the Preble's Meadow Jumping Mouse in various ways, each of

which is discussed below.

<strong>i</strong>

In Appellants' view, the Service's "discussion of the no action alternative

was deficient."  Aplts.' Opening Br. at 44 (capitalization removed).  A no-action

analysis "compare[s] the potential impacts of the proposed major federal action to

the known impacts of maintaining the status quo."  *Custer Cnty. Action Ass'n v.*

*Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001).  Appellants begin this section of

their brief with the statement that "NEPA requires agencies to evaluate a 'no

action' alternative to provide an environmental baseline."  Aplts.' Opening Br. at

44 (citing 40 C.F.R. § 1502.14(d)).  Here, though, there was no such requirement.

38

We have explained that § 1502.14 applies only to the EIS preparation process, not

to the preparation of EAs, and that a no-action analysis is therefore not

automatically necessary when an agency does only the latter. *See W. Watersheds

Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1274 (10th Cir. 2013).

Even though "the absence of a detailed No Action analysis by itself does

not render" an EA and its resulting FONSI arbitrary or capricious, *id.* at 1274, a

plaintiff may in some circumstances demonstrate "that the absence of a No Action

analysis compromised the EA so severely as to render the FONSI arbitrary and

capricious," *id.* at 1275.

The question of whether the Service's no-action analysis passes muster

turns on the nature of the various parcels involved in the land exchange.

According to the terms of the exchange, the Service acquired the surface, sand,

and gravel rights to Section 16 (acquired from the State of Colorado) and all of

the land in Section 3 (acquired from Energy).  With respect to these parcels,

Appellants first complain that "[t]he agency failed to disclose the current status of

Mouse habitat on" either section "and thus the EA omits the benchmark against

which the Land Exchange can be judged."  Aplts.' Opening Br. at 44–45.  In fact,

the EA noted that "section 16 contains some riparian habitat that is considered

suitable for [the] mouse," Aplts.' App. at 457, and the draft EA that was

circulated for public comment described the land acquired in the

exchange—which included Section 16—as "very important" to the mouse, Aplees.' J. Supp. App. at 227  (Draft Envtl. Assessment, prepared Sept. 2011). Short though these discussions may be, they undermine Appellants' insistence that the EA "failed to disclose the current status of Mouse habitat on the Section 16 property," Aplts.' Opening Br. at 44–45, and thus weaken the underlying premise of their position.

Taking a related tack, Appellants fault the Service for failing to disclose that the habitat within Sections 3 and 16 had been conserved; as a result, they reason, the exchange gave the mouse nothing, because it was already protected in the land acquired by the Service in the exchange.[14]  The Service responds that "[t]he fact that the Mouse habitat in Sections 3 and 16 already had some legal protections . . . does not undercut the stated benefit of permanently placing the land in federal ownership."  Aplees.' Br. at 57–58.  We agree.  In particular, the government notes that the conservation lease on Section 16 would have been

---

[14]     Appellants argue in passing in their section on mitigation measures (which are discussed *infra*) that Section 16 contains no habitat essential to the mouse because the Service did not designate any land within it critical habitat. Because Appellants do not make this argument with respect to the no-action analysis, there is no need to address it here.  In addition, we have no reason to believe that this alleged fact renders the Service's no-action analysis automatically arbitrary and capricious.  The Service stated why it considered Section 16 to be suitable habitat for the mouse, and it was reasonable—for no-action purposes—for the Service to consider the acquisition of 104 acres of mouse habitat worth the sacrifice of 12.4 acres (of 35,000 total acres) of critical habitat, regardless of whether or not the 104 was critical or just suitable habitat.

extinguished in the event the parcel was sold.  Appellants do not dispute that

assertion.  Thus, accepting this statement as true, the exchange did offer the

mouse a greater level of protection on Section 16.  An agency's duty to "inform

the public that it has indeed considered environmental concerns in its

decisionmaking process," *Wyoming*, 661 F.3d at 1236 (internal quotation marks

omitted), cannot plausibly be read to encompass environmental concerns that it

reasonably understands will not affect the bottom-line conservation calculus.

    With those background points in mind, there is evidence in the

administrative record that the acquisition of Section 16 brought into the federal

government's control 104 acres of suitable mouse habitat.[15]  In return, the Service

gave up approximately 12.4 acres of critical mouse habitat.  Utilizing the "highly

deferential" standard that we must, *W. Watersheds Project*, 721 F.3d at 1273, and

trusting the Service's expertise, *Flowers*, 359 F.3d at 1274, we uphold the

Service's cost-benefit analysis.

## ii

---

[15]    The Service does not contend that a precise assessment of how much
suitable mouse habitat Section 16 contains was circulated for public comment
prior to the execution of the exchange.  But the draft EA that was circulated for
public comment clearly indicated that the corridor had 12.4 acres of critical
mouse habitat, and indicated that the land acquired in the exchange—which
included Section 16—contained land "considered very important" to the mouse.
Aplees.' J. Supp. App. at 227.  Thus, the Service considered and presented to the
public the essential thought process regarding the mouse that led it to accept the
exchange: that it was, in the totality of circumstances, better for the mouse, not
worse.

Lastly, Appellants assert that the Service violated NEPA by not specifically addressing the acquired properties as "mitigation measures" for the exchange. However, in our view, Appellants misunderstand the Service's reasons for discussing the acquired properties in the EA. They were not mitigation measures at all. We begin by explaining the function of mitigation measures in the NEPA setting.

An agency "can decline to prepare an EIS even if it finds a potentially significant impact so long as it also finds 'changes or safeguards in the project sufficiently reduce the impact to a minimum.'" *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1172 (10th Cir. 2012) (quoting *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008)). These "changes or safeguards" constitute "mitigation measures" in the EA context and may negate the need to prepare an EIS. *Id.* However, an EA need only explore mitigation measures where it acknowledges the possibility that the agency action will cause environmental harm; the EA does so as a means of determining the extent to which the harm may be balanced out. *See, e.g.*, *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 234 (5th Cir. 2007) (discussing an EA that listed mitigation measures because it also "list[ed] the potentially significant adverse impacts" of the project). This stands to reason. An EA obviates the need for an EIS when the agency finds that the action "will not have a significant effect

42

on the human environment." 40 C.F.R. § 1508.13. It would make no sense to demand an articulation of mitigation measures when there is no anticipated harm to mitigate.

By contrast, an EIS presupposes the existence of significant environmental effects—that is, such effects are its raison d'être, *see, e.g.*, *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1131 (10th Cir. 2006); consequently, an EIS *must* include a discussion of mitigation measures, *see San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1053 (10th Cir. 2011) ("[A]n EIS must . . . discuss 'steps that can be taken to mitigate [a project's] adverse environmental consequences.'" (second alteration in original) (quoting *Robertson*, 490 U.S. at 351)).

Applying that framework, the Service was only required to include mitigation measures in its EA if it forecast a significant impact resulting from the exchange. The EA made no such forecast. Rather, as the Service rightly observes, the EA discussed the acquisition of Sections 3 and 16 (and the other parcels transferred to the Service under the deal) as *part* of the proposed agency action, not as a mitigation measure to compensate for some separate action. It is therefore appropriate that the EA omitted any section with the word "mitigation" in the title, and Appellants' mitigation arguments do not entitle them to relief.

**iii**

43

It is Appellants' position that the Service ran afoul of NEPA when it shielded from public notice and comment the documents the EA relied upon for its statements regarding the mouse.  When preparing an EA, an "agency shall involve . . . the public . . . to the extent practicable."  40 C.F.R. § 1501.4(b). Plainly, this language affords an agency "considerable discretion to decide the extent to which such public involvement is 'practicable.'"  *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 121 (2d Cir. 2013); *see Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (observing that an agency enjoys "significant discretion in determining when public comment is required with respect to EAs"); *see also Flowers*, 359 F.3d at 1279 ("NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS.").

Our *Flowers* decision compels a finding that the Service acted well within the confines of this substantial discretion.  There, we upheld an agency against a similar challenge where it failed to circulate for public comment various documents supporting its environmental assessment.  359 F.3d at 1279.  One of those documents was a biological opinion, the very document that Appellants focus on here.  *Id.*  Rejecting the appellants' argument in *Flowers*, we emphasized that the circulated notice indicated that the project would likely affect bald eagles, the species at issue, and found that sufficient to satisfy the public-involvement

aspect of NEPA under the circumstances. *Id.*

The logic of *Flowers* applies *a fortiori* to the instant appeal. In *Flowers*, the assessment *itself* was never circulated, *id.*, which was not the case here. And, just as in *Flowers*, the circulated notice did mention the possibility of impacts on the mouse, and the notice was presumably sufficient since the comments themselves then brought the issue up. Thus, there is even more reason here to uphold the agency action than in *Flowers*. In sum, Appellants fail to disturb the "presumption of validity [that] attaches to the agency action." *Prairie Band*, 684 F.3d at 1008 (quoting *Richardson*, 565 F.3d at 704) (internal quotation marks omitted).

### iv

In Appellants' opinion, the Service's decision to conduct an intra-agency consultation regarding the potential effect of the parkway on the mouse "undermines [its] NEPA findings on the same agency action," Aplts.' Opening Br. at 41, because a formal consultation only occurs when an action is "likely to adversely affect" a species and that very finding required the Service to also prepare a full EIS and not just an EA, *id.* (quoting 50 C.F.R. § 402.13). Appellants have no authority to support the proposition that once an agency initiates the consultation process it is precluded from issuing an EA rather than an EIS. Under our binding precedent, that is clearly not the case. *See Flowers*, 359

F.3d at 1265, 1276 (upholding an agency's decision to prepare only an EA despite the fact that it initiated—and reinitiated—consultation with the Service); *cf. Cold Mountain v. Garber*, 375 F.3d 884, 893 (9th Cir. 2004) (affirming an agency's decision not to prepare an EIS in part *because* it engaged in consultation with the Service beforehand). Accordingly, Appellants do not demonstrate a NEPA violation on this ground.

v

Appellants contend that the Service violated NEPA by relying on the first biological opinion, when its decision to get a second opinion reveals the first to be inadequate. However, as the district court before us held, the two biological opinions reach the same ultimate conclusion: that the land exchange did not jeopardize the continued existence of the mouse. It is entirely unclear how the fact of the reinitiation and subsequent biological opinion has any bearing on the Service's decision to forgo an impact statement, and Appellants offer no assistance in detecting such a connection.

For all of these reasons, we reject Appellants' NEPA claim.

C

Having disposed of Appellants' NEPA claim, we now take up their ESA argument. The entirety of Appellants' ESA-based argument is premised on the notion that "[the Service] unlawfully *failed* to issue [a take statement] for the land

exchange." Aplts.' Opening Br. at 52 (emphasis added) (capitalization removed).[16]

An agency is required to consult with the Service under the ESA whenever it plans to take an action that "may affect" a threatened species or its critical habitat. 50 C.F.R. § 402.14(a). As a culminating act of the consultation process, the Service "formulates a biological opinion." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1105 (10th Cir. 2010); *see* 50 C.F.R. § 402.14(g)(4) (noting that the Service is responsible "during formal consultation" for "[f]ormulat[ing] its biological opinion"). A biological opinion is "a written statement determining whether the proposed action 'is likely to jeopardize the continued existence of listed species.'" *Rio Grande Silvery Minnow*, 601 F.3d at 1105 (quoting 50 C.F.R. § 402.14(g)(4)).

The Service is also charged during the consultation process with "formulat[ing] a statement concerning incidental take, *if* such take *may* occur."

---

[16]    *See also* Aplts.' Opening Br. at 16 ("[The Service] *failed* to issue the mandatory [take statement] for the Land Exchange." (emphasis added)); *id.* at 53 ("As detailed below, [the Service] had a mandatory duty to issue [a take statement] for the Land Exchange."); *id.* at 56 ("[The Service's] Consultation Handbook dictates that [a take statement] was mandatory in connection with the Land Exchange."); *id.* ("By not issuing [a take statement], [the Service] failed to ensure the Mouse will be protected from the Land Exchange."); Aplts.' Reply Br. at 25 ("[The Service] violated the [ESA] by not issuing an incidental take statement." (capitalization removed)); *id.* (noting the Service's "failure to issue [a take statement] for the Land Exchange"); *id.* at 26 ("[T]he ESA requires, in no uncertain terms, that [the Service] issue [a take statement] for the Land Exchange now.").

50 C.F.R. § 402.14(g)(7) (emphases added); *see* 16 U.S.C. § 1536(b)(4)(i)

(providing that the Service "shall provide the Federal Agency . . . with a written

statement that . . . specifies the impact of such incidental taking on the species");

50 C.F.R. § 4012.14(i)(1) (noting that an incidental take statement "[s]pecifies the

impact, i.e., the amount or extent of such incidental taking on the species").  "The

term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture,

or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19);

*accord Rio Grande Silvery Minnow*, 601 F.3d at 1106 n.4.

     The take statement is "a permit authorizing the action agency to 'take' the

endangered or threatened species so long as it respects the Service's terms and

conditions."  *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (internal quotation

marks omitted).  "In those cases where the Service concludes that an action (or

the implementation of any reasonable and prudent alternatives) and *the resultant

incidental take* of listed species will not violate [the ESA], . . . the Service will

provide *with the biological opinion* a statement concerning incidental take . . . ."

50 C.F.R. 402.14(i)(1) (emphases added) (citations omitted); *see Rio Grande

Silvery Minnow*, 601 F.3d at 1106 (describing the conditions under which an

incidental take statement may be issued).

     As noted, Appellants' ESA argument is predicated solely on the assertion

that the Service unlawfully failed to issue an incidental take statement regarding

the land exchange.  We reject this contention.  At the outset, we observe that arguably the Service was not legally required to issue an incidental take statement at all for the land exchange.  This is because, in the course of issuing two biological opinions indicating that the exchange would not jeopardize the continued existence of the mouse or adversely modify its critical habitat, the Service expressly stated that it "anticipate[d] that the proposed land exchange will not result in incidental take of the [mouse]."  Aplts.' App. at 365 (Biological Op., prepared Nov. 17, 2011).

The plain terms of the statute and regulations suggest that, at least where there is no evidence that a take may occur, the Service need not issue an incidental take statement.  *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1241 (9th Cir. 2001) (endorsing the view that "the plain language of the ESA does not dictate that the [Service] issue an Incidental Take Statement irrespective of whether any incidental takings will occur"); 50 C.F.R. § 402.14(g)(7) (noting that the Service is tasked with "formulat[ing] a statement concerning incidental take, *if* such take *may* occur" (emphases added)); *see also Defenders of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1122–23 (11th Cir. 2013) (noting that because the "biological opinion concluded that no take of listed species is likely to occur from" the agency action at issue, "no incidental take statement was required"); *cf. Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1240–41

49

(rejecting the Service's argument that "it should be permitted to issue an Incidental Take Statement whenever there is any possibility, no matter how small, that a listed species will be taken").  We need not definitively opine on this interpretive point, however.  Because, even if the Service was obliged for some reason to issue an incidental take statement as to the land exchange, we find evidence in this record that it sufficiently did so—evidence that Appellants do not bother to acknowledge, much less rebut.

In this regard, *both* biological opinions contain a section clearly labeled "incidental take statement."  *See* Aplts.' App. at 364; *id.* at 574 (Biological Op., prepared Feb. 14, 2012).  In the first biological opinion, though noting that it "anticipate[d] that the proposed land exchange w[ould] not result in incidental take of [the mouse]," the Service explicitly recognized that the related "use of the 300-foot strip of land . . . may result in take, and the project proponent will be required to obtain incidental take coverage . . . when a project has been defined and proposed." *Id*. at 365.  The second opinion is of a similar stripe but provides greater detail: it indicates that the construction of the parkway, "which is *interdependent upon [the] proposed land exchange*, will result in the incidental take of 12.4 acres of . . . mouse habitat and in the take of no more than one individual mouse." *Id.* at 575 (emphasis added).

Appellants offer no reason for us to consider these passages as anything

other than what they purport to be: incidental take statements pertaining to the

land exchange.[17]  Consequently, we hold that even if the Service was required to

issue an incidental take statement with respect to the land exchange, Appellants

have not established on this record that the Service has not sufficiently done so.

Accordingly, we uphold the district court's judgment regarding Appellants' ESA

claim.[18]

---

[17]     In a letter of supplemental authority, Appellants endeavor to rely
upon *Public Employees for Environmental Responsibility v. Beaudreu*, 25 F.
Supp. 3d 67 (D.D.C. 2014), to support their argument regarding the incidental-
take-statement issue.  They note that the district court in *Beaudreu* rejected the
government's suggestion that the possibility of reconsultation mooted the need for
a take statement.  Here, though, the fundamental problem with Appellants'
position is that the record contains two biological opinions with respective
sections entitled "incidental take statement," and Appellants have given us no
reason to suppose that they are anything other than take statements.  In the cited
section of *Beaudreu*, *see id.* at 114–15, the court does not indicate that there were
any similar documents in that record, so the case cannot help Appellants
overcome this hurdle.

[18]     Appellants assert in passing that "[The Service] failed to limit the
amount of take, identify mandatory terms and conditions to minimize harm, and
impose requirements for monitoring and reporting."  Aplts.' Opening Br. at 57.
This argument too is explicitly tied to Appellants' unsubstantiated claim that the
Service failed to issue a take statement, as they conclude their point shortly
thereafter with the following statement: "In short, [the Service] undermined the
purpose of [a take statement] by not issuing one for the Land Exchange."  *Id.*
Accordingly, because it is without footing in the record, this assertion need not be
addressed.  However, it is worth noting that the reason the biological opinions
omitted some of these specific terms is because the entities building the parkway
"will be required to obtain incidental take coverage . . . when a project has been
defined and proposed."  Aplts.' App. at 575.  Appellants provide no meaningful
reasoning to explain why it was arbitrary and capricious for the opinions to take
this approach.  *Cf. Defenders of Wildlife*, 733 F.3d at 1123–24 (holding that "it

(continued...)

**D**

Appellants seek leave to file a supplemental appendix.  The Service opposes the motion but asks, in the event it is granted, to be allowed to file its own supplement.  We conditionally allowed both parties to file their supplemental submissions but reserved the right to exclude them.  Upon further consideration, we conclude that each of Appellants' submitted documents could and should have been included in their original appendix if they wanted to rely upon them.  *See* 10th Cir. R. 30.1(A)(3) ("The court need not remedy any failure of counsel to provide an adequate appendix.").  We accordingly deny Appellants' motion to file a supplemental appendix.  As for the Service, its documents are only submitted in response to Appellants', and since we are denying Appellants' motion, we deny the Service's as moot.

**IV**

For the reasons stated, we **AFFIRM** the judgment of the district court,

---

[18](...continued)

was not arbitrary or capricious for the [agency] to postpone the issuance of an incidental take statement," *inter alia*, because the "corresponding incidental take statement, which will pertain *solely to operations* on the [agency project], will serve no purpose while the [project] is still in the installation phase and no operations are actually occurring" (emphasis added)).  *See generally Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1126 (9th Cir. 2012) (applying the arbitrary-and-capricious standard while evaluating the content of a take statement).  Thus, to the extent Appellants could be understood to argue that the *terms* of the incidental take statements are insufficient, they fail to show that they are.

**DENY** Appellants' motion to file a supplemental appendix, and **DENY** the

Service's motion to file a supplemental appendix as moot.